IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

UNITED STATES OF AMERICA

v.

SANTAS HERNANDEZ,

Defendant.

CRIMINAL CASE NO.

1:12-CR-00322-AT-JFK

## REPORT AND RECOMMENDATION

Pending before the court is Defendant Santas Hernandez' motion [Doc. 13] to suppress evidence obtained during a detention occurring on June 24, 2012.  On that date, the Government seized quantities of U.S. currency as the result of a search of Defendant's vehicle and obtained statements from Defendant.   [Doc. 38].   An evidentiary hearing was held on March 27, 2013.[1]  [Doc. 31].  Defendant seeks to suppress both the U.S. currency and her statements alleging that the detaining officer lacked probable cause for the traffic stop or a reasonable suspicion for a Terry stop [Doc. 38 at 6-9]; that, even if the initial stop was lawful, the duration of the detention was unreasonable [Id. at 9-11]; that Defendant was in custody at the time she made her

---

[1]Citations to the transcript are:  (Tr. at ).

statements and should have been advised of her <u>Miranda</u> rights [<u>Id.</u> at 12-15]; and finally that Defendant's consent to search the vehicle was involuntary and the search exceeded the scope of any consent [<u>Id.</u> at 15-21]. The Government opposes the motion to suppress. [Doc. 45]. The Government asserts that the officer had probable cause for the traffic stop or, in the alternative, that there was reasonable suspicion to detain Defendant for a <u>Terry</u> stop [Doc. 45 at 18-22]; that Defendant's consent to search was voluntary or, in the alternative, that there was probable cause to search the vehicle [<u>Id.</u> at 22-29]; and that the duration of the stop was reasonable such that Defendant was not in custody requiring <u>Miranda</u> warnings [<u>Id.</u> at 30-35]. After consideration of the arguments of Defendant and the Government and of the totality of the circumstances, the court **RECOMMENDS** that Defendant's motion to suppress be **DENIED**.

I.    **Facts**

In July 2010, investigators with the vice unit of the Gwinnett County Police Department advised Criminal Investigator Lucas Yates, Homeland Security ("HSI"), that they had received information from a juvenile regarding "her being transported from the Atlanta area to a nightclub in the Montgomery, Alabama area for the purpose of engaging in commercial sex acts with patrons of a bar there." (Tr. at 71, 93). Yates spoke to the juvenile who advised that her aunt, Defendant Santas Hernandez,

transported her and other women from Atlanta to Montgomery.  (Id.).  During the investigation that followed, HSI investigators determined that Defendant routinely traveled in a 2003 Honda Odyssey, silver/gun-metal gray, from Atlanta to Birmingham, Alabama, and frequented a nightclub, the Yellow Rose.  (Tr. at 70, 77).

After ascertaining where Defendant lived in Gwinnett County, the investigators conducted surveillance and observed her traveling from location to location picking up females, and on a few of occasions, including as recently as June 2012, the investigators followed Defendant with the females in her Honda to the nightclub in Birmingham.  (Tr. at 72-73).  Defendant used I-20, traveling to Birmingham on Friday and returning to Atlanta on Sunday.  (Tr. at 70).  Upon arriving at the nightclub, while in the vehicle, the women applied make-up and changed clothes.  (Tr. at 73-74, 94). During one surveillance at the nightclub, investigators observed the Honda going to a hotel, where it remained for thirty to forty minutes, before returning to the nightclub. (Tr. at 74).

The investigators also utilized an undercover agent, with a confidential informant, to enter the nightclub to speak with Defendant Hernandez.  The undercover agent spoke to Defendant about arranging dates for a fictitious party that he was having for a friend.  (Tr. at 74-75).  Defendant expressed an interest in supplying the women

3

for the party, but there was no mention of prostitution, and she and the undercover agent engaged in some subsequent text messages about the party. Due to the fact that the investigators did not attempt to carry-through with the operation, nothing else occurred. (Tr. at 76-77, 95-96).

On or about June 24, 2012, Investigator Yates contacted Deputies Justin Manwaring and Nathan Yount, Douglas County Sheriff's Office, Felony Interception Narcotic Detection Unit ("FIND"), to request assistance in conducting, if a traffic violation was observed, a traffic stop of Defendant's vehicle as it returned from Birmingham on I-20 that Sunday. (Tr. at 11, 77-78, 80, 104). The investigator anticipated that the women traveling in the vehicle would have currency with them because "prostitutes are known to carry the proceeds of their trade with them." (Tr. at 79). He provided the deputies with a "good foundation" of the information obtained during the investigation. (Tr. at 78-79).

Deputy Manwaring after receiving the information about the investigation from the investigator, including a vehicle description, established surveillance on the interstate, east of the Tyson Road exit, setting perpendicular to Interstate I-20.[2] He was

_____

[2]The deputy had been a member of the FIND unit for two years. The purpose of the unit was to apprehend offenders who were transiting the expressway. (Tr. at 7-8). He had over one-hundred hours of specialized training and averaged over fifty

4

in a marked patrol vehicle.  (Tr. at 11-14).[3]  The day was sunny and hot, and the traffic on the interstate was light to medium.  (Tr. at 12-13).  At approximately 1:20 p.m., he observed Defendant's vehicle as it passed heading east.[4]  (Tr. at 14, 17).

The deputy entered the interstate and began following Defendant's Honda.  (Tr. at 15).  The patrol vehicle has audio and video recording capability, which the deputy activated.  (Tr. at 16-17; Gov't Ex. 2).  However, before the recording began, near the Post Road exit, the deputy observed the Honda, which was in the center lane of traffic, drift over into the right lane of traffic.  At that time, there was a vehicle in the right lane taking the exit onto to Post Road.  (Tr. at 18, 64-65).  The deputy then pulled up beside the Honda, and by this time, other traffic had fallen back behind the patrol vehicle.  (Tr. at 53, 64-65).  The deputy then observed the right side tires of the Honda drift onto the white line marking the lanes of the interstate, which he pointed out as

---

traffic stops a month for various traffic and equipment related violations.  (Tr. at 8-9). When asked to assist other agencies and "perform traffic stops," he will do so if there is a valid reason for the stop; if not, the vehicle is allowed to continue out of the county.  (Tr. at 9-10).  Prior traffic stops had resulted in the seizure of evidence, including U.S. currency.  (Tr. at 10).

[3]Deputy Yount was waiting nearby.  (Tr. at 14).

[4]In this area, I-20 is three lanes of traffic in each direction.  (Tr. at 14).

AO 72A
(Rev.8/82)

observable on the video recording.[5]  (Tr. at 17-18, 52, 64).  Having observed two violations of failure to maintain lane, the deputy activated his blue lights and conducted a traffic stop of Defendant's Honda.  (Tr. at 18, 52, 65).

The deputy[6] exited his vehicle and approached the Honda on the passenger side. Inside he observed a number of females, a couple were in bathrobes, and a lot of suitcases and other items.  (Tr. at 19-20, 54).  After explaining why he had stopped the vehicle and requesting Defendant Hernandez's driver's license and vehicle registration, the deputy asked Defendant to exit her vehicle and to join him in the patrol vehicle for him to issue her a warning.[7]   (Tr. at 20-21; Doc. 45, Attachment A at 2).   At approximately four minutes into the traffic stop, Deputy Manwaring began speaking

---

[5]The court has viewed the video recording, which in the court's opinion, confirms the deputy's testimony.  (Gov't Ex. 2 at 0.47 seconds).  Arguably, the right side tires also touched the lane marking lines prior to and after that occasion.  (Gov't Ex. 2 at 0.27 seconds and at 1.01 seconds).

[6]He was attired in his uniform, including wearing a holstered firearm which was visible.  (Tr. at 20).  He never displayed his firearm during the encounter.  (Tr. at 20).

[7]Due to the hazards of standing on the side of the interstate, such as being hit by flying debris, and because of being able to record the conversation inside the patrol vehicle, the deputy as a matter of practice requests that drivers sit inside the patrol vehicle.  (Tr. at 20-22).

6

to Defendant.[8]  (Tr. at 22).  After discussing the failure to maintain lane violation, the deputy asked questions about where Defendant had been and for how long and about the passengers in the Honda.  (Doc. 45, Attachment B at 2-5).  Defendant mentioned that her nieces were going to the airport for a 3:00 flight to Puerto Rico.  (Tr. at 23-24).

He next asked Defendant if she had any weapons or drugs in the Honda and explained to her that I-20 is "bad for drugs and guns and money . . . ."  Defendant responded, "I know."  (Doc. 45, Attachment B at 5).  Defendant denied that any such items were in the Honda and stated, "No drinking because me pregnant."[9]  (Doc. 45, Attachment B at 5).  At approximately seven and one-half minutes into the stop, Deputy Manwaring asked Defendant for permission to search the Honda and the contents of the van for drugs or guns or money, including "[e]verything inside I can search?"  Defendant responded, more than once, "Yes."  (Tr. at 23, 25; Doc. 45, Attachment B at 5).  During this time, Defendant was calm and did not request to leave.  (Tr. at 23).  And during the conversation, the deputy was requesting a check of

---

[8]Defendant advised the deputy that her English was not good.  (Tr. at 53).  As evidenced by the recordings, the deputy's conversation with Defendant was in English. (Gov't Ex. 2).

[9]A couple of minutes earlier, when discussing the traffic violation, the deputy had asked Defendant if she was tired or had been drinking.  (Doc. 45, Attachment B at 2).

7

the vehicle registration and Defendant's driver's license and whether there were any warrants for Defendant on GCIC.  No results had been received.  (Tr. at 24-25).

The deputy then asked for Deputy Yount to provide back up and asked Defendant to exit the patrol vehicle.  Returning to the Honda, he requested each occupant, as he identified them by obtaining a form of identification, to exit the Honda.[10]  (Tr. at 25-26, 28-29; Doc. 45, Attachment A at 7-8).  When the deputy looked inside the Honda, he observed numerous purses each with bundles of U.S. currency lying in plain view on the top.  He stated that, based on his experience, the manner in which the currency was kept, folded with rubber-bands, was not usual for innocent travelers.  (Tr. at 27, 55-57).  When Deputy Yount observed the bundles of currency, he advised Deputy Manwaring, "It's all working cash from where they made it last night it looks like.  You know how - - how dope boys keep their cash?  It's kept the same way."  (Doc. 45, Attachment C at 5).  The deputy also found boxes of condoms in the Honda.  (Tr. at 28).  While the search was being conducted, the deputies also learned that there was a question about the validity of Defendant's

---

[10]The deputy also requested checks on those identifications through GCIC.  (Tr. at 29).

driver's license, and the deputies questioned Defendant about the license.  (Tr. at 29; Doc. 45, Attachment A at 10-11, Attachment C at 5-6).

Deputy Manwaring enclosed the U.S. currency lying on top of each purse in that purse, removed the purses from the Honda, and placed the purses on the hood of the patrol vehicle in order for each occupant to identify her purse.[11]  (Tr. at 29-33, 55-57). Deputy Yount first asked Defendant Hernandez questions about her travel and then asked her about the currency found with the purse that she claimed to belong to her. (Tr. at 30-31, 33, 35-36; Doc. 45, Attachment C at 6-9).  Defendant stated that there was $2,600 in the purse but that all of the money did not belong to her and that part belonged to her cousin who was still in Alabama and returning tomorrow.  (Doc. 45, Attachment C at 8-9).

Another deputy, David Whitehead had arrived to provide back-up, and HSI Investigator Yates arrived soon thereafter.  (Tr. at 35-36, 59).  After explaining to Investigator Yates what had transpired, the investigator asked if it would be possible

_____

[11]During this time, approximately twenty minutes into the stop, the deputies had not received information concerning the requests from GCIC, including verification of Defendant's driver's license.  (Tr. at 33, 35).

9

to move to a less hazardous location to complete the processing of the evidence.[12] They decided, if Defendant agreed, to move to the Jo-Ann's parking lot located at the next exit.  (Tr. at 39-40; Doc. 45, Attachment B at 12).  Investigator Yates intended to administratively seize the currency pursuant to 18 U.S.C. §§ 1591 and 2421, and if a juvenile had been present, § 2423(a), and he sought a safer place to process the forfeiture paperwork.  (Tr. at 84-86, 105, 107).

Approximately thirty-four to thirty-six minutes into the stop, Deputy Manwaring asked Defendant, "Will you follow me to the next exit?  You'll follow me.  Okay.  Do you understand?"  (Tr. at 40-41, 44; Doc. 45, Attachment B at 11).  Defendant responded, "Yes.  Yes."  (Tr. at 40-41; Doc. 45, Attachment B at 11).  The deputy then explained to Defendant that she should follow him and that the other officers would follow her.  (Tr. at 45; Doc. 45, Attachment B at 11).  He advised Defendant and the other females that the officers would hold the wallets and purses to allow the items to be on camera so that nothing could be removed.  He stated that the wallets and purses would be returned at the parking lot.  (Tr. at 42-44; Doc. 45, Attachment B at 12).  No

---

[12]The Honda's occupants had been sitting on a hill away from the side of the road.  (Tr. at 101).  Deputy Manwaring testified that the purpose of relocating was for the safety of everyone.  (Tr. at 40).

10

one had been or was later handcuffed, and no one had asked to leave.[13]  (Tr. at 44).

Deputy Manwaring attempted to follow-up on the GCIC checks because he had not yet

heard back.[14]  (Tr. at 46).

At the Jo-Ann's parking lot, the Honda was not searched any further.  (Tr. at

48).  The HSI investigators[15] processed the administrative paperwork for the currency

found with each purse and obtained the biographical information from each occupant

of the Honda to provide forfeiture notice.  (Tr. at 86-91, 101-02).  At approximately

one hour-nineteen minutes into the stop, the investigators spoke to Defendant to

process the paperwork to seize the $2,664 found with Defendant's purse.  (Tr. at 90-

91; Doc. 45, Attachment C at 51-60).  Defendant was not advised of her Miranda

rights.  (Tr. at 98).  Defendant again stated that only part of the currency, $900, was

hers and that the rest belonged to a woman named Rose who was returning tomorrow.

---

[13]Defendant did begin moving the Honda without waiting for the deputy to go first; however, there is no indication that Defendant was attempting to flee, and a deputy did take the lead, and Defendant followed him.  (Tr. at 62-63, 66; Gov't Ex. 2).

[14]The deputy later determined that Defendant's driver's license was valid but expired.  (Tr. at 59-61).  At Jo-Ann's parking lot, the deputy stated that, while he could not understand what was going on with the identification, if it was just expired, he was "not really too concerned . . . ."  (Doc. 45, Attachment A at 17).

[15]The investigators were in causal clothing, and their firearms were concealed. (Tr. at 92; Gov't Ex. 2).

11

(Tr. at 106; Doc. 45 at Attachment C at 53-55). Defendant was not handcuffed or arrested but allowed to leave with the other women once the paperwork was completed. According to Investigator Yates, she was pleasant and normal, and the investigators did not raise their voices in speaking with her.[16] (Tr. at 91-93). Once the processing was complete, Deputy Manwaring gave Defendant a warning for failure to maintain lane, in violation of O.C.G.A. § 40-6-48. All of the wallets, identifications and purses were returned Defendant and the other females. (Tr. at 37-39, 50, 53-54, 106; Gov't Ex. 1). Approximately one hour-forty-eight minutes had elapsed when the stop was completed. (Tr. at 49).

Additional facts will be set forth as necessary in discussion of Defendant's motion to suppress.

_____

[16]This conversation with Defendant was also predominately in English. (Tr. at 98; Gov't Ex. 2). The court viewed all of the parts of the video recordings in which Defendant interacted with the deputies and investigators. Throughout, and especially at the parking lot, Defendant was entirely comfortable and casual in her interaction with the law enforcement officers. She did not request or even infer a desire to leave. Although Defendant was not fluent in English, she communicated with the deputies and investigators in English - even when asked questions in Spanish. The HSI investigator, who was present to communicate with her and the Honda's passengers as needed in Spanish, stated, "She speaks pretty good English." (Doc. 45, Attachment C at 59).

AO 72A
(Rev.8/82)

## II.     Discussion

As noted, Defendant seeks to suppress the evidence, U.S. currency, seized and the statements that she made on June 24, 2012.  [Docs. 13, 38].  She contends that there was neither probable cause for the traffic stop nor reasonable suspicion for a Terry stop; that, if the initial stop was lawful, the duration of the stop was unreasonable; that her consent was not voluntary and that the search exceeded the scope of any consent; and that she should have been but was not advised of her Miranda rights prior to questioning.  [Doc. 38].  The Government responds that the initial stop was lawful and that the duration of the detention was reasonable; that the consent was voluntary but not necessary because there was probable cause for the search; and that Defendant was not in custody and that Miranda warnings were not required.  [Doc. 45].

### A.     Initial Stop and Detention

"A traffic stop, which 'is a seizure within the meaning of the Fourth Amendment,' . . . 'is constitutional if it is either based upon probable cause to believe a traffic violation has occurred or justified by reasonable suspicion in accordance with Terry[v. Ohio, 88 S. Ct. 1868 (1968)].'"  United States v. Spoerke, 568 F.3d 1236, 1248 (11th Cir. 2009) (citations omitted).  As the Eleventh Circuit Court of Appeals

13

stated in <u>United States v. Cooper</u>, 133 F.3d 1394 (11th Cir. 1998), "law enforcement 'may stop a vehicle when there is probable cause to believe that the driver is violating any one of the multitude of applicable traffic and equipment regulations relating to the operation of motor vehicles.'" <u>Id.</u> at 1398 (quoting <u>United States v. Strickland</u>, 902 F.2d 937, 940 (11th Cir. 1990)); <u>see also</u> <u>United States v. Terry</u>, 220 Fed. Appx. 961, 963 (11th Cir. 2007) (same).  And "[w]hen determining whether an officer had probable cause to believe that a traffic violation occurred, the 'officer's motive in making the traffic stop does not invalidate what is otherwise objectively justifiable behavior under the Fourth Amendment.'"[17]  <u>United States v. Harris</u>, 526 F.3d 1334, 1337 (11th Cir. 2008) (citation omitted); <u>see also</u> <u>United States v. Gonzalez</u>, 2009 WL 243732, at *3 (M.D. Ala. August 7, 2009) (rejecting the defendant's contention that traffic stop for improper or erratic lane change was a pretext to conduct a search for contraband).  Accordingly, the fact that the deputy in this case conducted a stop at the request of the

---

[17]The law is well established that "'[s]ubjective intentions play no role in ordinary, probable-cause Fourth Amendment analysis.'" <u>United States v. Jones</u>, 377 F.3d 1313, 1314 (11th Cir. 2004) (quoting <u>Whren v. United States</u>, 116 S. Ct. 1769, 1774 (1996)); <u>see also</u> <u>United States v. Hernandez</u>, 418 F.3d 1206, 1209 n.4 (11th Cir. 2005) ("[a]n officer's 'subjective intentions' are not relevant for Fourth Amendment analysis").

14

HSI investigator does not factor into the reasonableness of making the stop because of the traffic violation.

Although Defendant argues that Deputy Manwaring lacked probable cause to conduct the traffic stop, the evidence supports the deputy's decision. [Doc. 38 at 6-8]. The deputy testified that, after he observed Defendant's vehicle as it passed in the center lane of traffic heading east on I-20, he entered the interstate and began following the Honda. (Tr. at 11-14, 17). Near the Post Road exit, the deputy observed the Honda drift over into the right lane of traffic. At that time, there was a vehicle in the right lane taking the exit onto to Post Road. (Tr. at 18, 64-65). The deputy then pulled up beside the Honda, and by this time, other traffic had fallen back behind the patrol vehicle. (Tr. at 53, 64-65). The deputy then observed the right side tires of the Honda drift onto the white line marking the lanes of the interstate, which he pointed out as observable on the video recording. (Tr. at 17-18, 52, 64; Gov't Ex. 2). The court has viewed the video recording, which in the court's opinion, confirms the deputy's testimony. (Gov't Ex. 2 at 0.47 seconds). Having observed two violations of failure to maintain lane, the deputy activated his blue lights and conducted a traffic stop of Defendant's Honda. (Tr. at 18, 52, 65).

15

These observations established justification for a stop of the Honda for a violation of O.C.G.A. § 40-6-48.[18]  See Acree v. State, 319 Ga. App. 854, 855, 737 S.E.2d 103, 105 (2013) (videotape showing the defendant's vehicle touching center line, drifting back, and touching the right fog line sufficient to establish grounds for traffic stop) (citing, *inter alia*, Polk v. State, 305 Ga. App. 677, 679, 700 S.E.2d 839, 841 (2010) ("officer's stop of defendant was authorized where evidence showed that defendant weaved within his lane of travel")); Rayo-Leon v. State, 281 Ga. App. 74, 75, 635 S.E.2d 368, 370 (2006) ("'[w]eaving without reason into nearby lanes violates [O.C.G.A. § 40-6-48(1)]' and justifies a stop") (citing, *inter alia*, Worsham v. State, 251 Ga. App. 774, 775, 554 S.E.2d 805, 807 (2001) ("officer authorized to initiate traffic stop after observing driver fail to maintain lane")).[19]   The traffic stop was lawfully initiated.

---

[18]This statute provides in pertinent part:  "A vehicle shall be driven as nearly as practicable entirely within a single lane until the driver has first ascertained that such movement can be made with safety[.]"  O.C.G.A. § 40-6-48(1).

[19]None of the cases found by the court nor cited by Defendant require the officer to establish, for the purpose of conducting a stop, that a driver did more than cross the lane marker line.  The cases do not require the officer to establish that a driver had failed to ascertain he could change lanes safely.  [Doc. 38 at 6-8].  While such factors might determine guilt or innocence, the court finds that the case law does not require more than the evidence presented in this case to establish probable cause to conduct the stop.

16

The legality of traffic stops is analyzed under the test set forth in <u>Terry</u>.  "[A] traffic stop 'must last no longer than is necessary to effectuate the purpose of the stop.'"  <u>United States v. Ramirez</u>, 476 F.3d 1231, 1237 (11th Cir. 2007) (quoting <u>United States v. Pruitt</u>, 174 F.2d 1215, 1220 (11th Cir. 1999)).  Absent articulable suspicion of other criminal activity, a traffic stop may last no longer than necessary to process the traffic violation.  <u>United States v. Purcell</u>, 236 F.3d 1274, 1277 (11th Cir. 2001).  The duration of a traffic stop, however, may be prolonged to investigate, by the use of computer checks, the driver's license and the vehicle registration and, for officer's safety, the criminal history of the driver.  <u>United States v. Boyce</u>, 351 F.3d 1102, 1106 (11th Cir. 2003)[20]; <u>Purcell</u>, 236 F.3d at 1277-78.  Additionally, an officer conducting a routine traffic stop may request consent to search the vehicle.  <u>Harris</u>, 526 F.3d at 1339; <u>Purcell</u>, 236 F.3d at 1281; <u>United States v. Simmons</u>, 172 F.3d 775, 778 (11th Cir. 1999).

---

[20]However, each of these computer checks must be conducted as a routine part of the traffic stop and not undertaken after the conclusion of the traffic stop to further detain a driver absent articulable suspicion of other criminal activity. <u>Boyce</u>, 351 F.3d at 1107 (finding that the criminal history check in that case was not requested until several minutes after the traffic stop had concluded and after the officer had asked for and been refused consent to search the vehicle).

17

And, as noted, even if the deputy lacked probable cause for the traffic stop based on a violation of § 40-6-48, law enforcement officers may also briefly detain individuals for purposes of investigating a crime if they have a reasonable, articulable suspicion based on objective facts that the individual has engaged in, or is about to engage in, criminal activity.  See Terry, 88 S. Ct. 1868; Harris, 526 F.3d at 1337 (same); United States v. Lindsey, 482 F.3d 1285, 1290 (11th Cir. 2007) (same).  "[T]he 'reasonableness' standard requires that a police officer 'be able to point to specific and articulable facts, which, when taken together with rational inferences from those facts, reasonably warrant that intrusion.'"[21]  United States v. Mikell, 102 F.3d 470, 474-75 (11th Cir. 1996) (citing Terry, 88 S. Ct. at 1880); see also United States v. Blackman, 66 F.3d 1572, 1576 (11th Cir. 1995) ("The reasonableness of the officers' conduct must

---

[21]And those inferences are considered in light of the training and experience of the law enforcement officers conducting the investigation.  See Lindsey, 482 F.3d at 1290-91 ("We also recognize that the police may 'draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that might well elude an untrained person.'") (citation omitted); United States v. Smith, 201 F.3d 1317, 1323 (11th Cir. 2000) ("In deciding whether the detaining officers had reasonable suspicion, we look at the totality of the circumstances known to the detaining officers at the time of the detention[,]" which includes viewing all of the circumstances "in the light of the officers' special training and experience."); United States v. Diaz-Lizaraza, 981 F.2d 1216, 1221 (11th Cir. 1993) ("While none of these actions is criminal on its face, together they did provide the trained agents with reasonable suspicion" that the defendant was involved in criminal activity.).

18

be judged against an objective standard:  would the facts available to the officer at the moment of the seizure or search warrant a man of reasonable caution in the belief that the action taken was appropriate.") (citations and internal quotation marks omitted)). Additionally, "[d]uring a lawful traffic stop, officers . . . may take steps that are reasonably necessary to protect their personal safety . . . , including requiring the driver and passengers to exit the vehicle 'as a matter of course.'"  Spoerke, 568 F.3d at 1248 (quoting Maryland v. Wilson, 117 S. Ct. 882, 884 (1997); Pennsylvania v. Mimms, 98 S. Ct. 330, 333-34 (1977)).

Based on the investigation conducted by HSI, the substance of which had been relayed to the Douglas County Sheriff Deputies, there was a reasonable suspicion that Defendant Hernandez, utilizing the Honda, was engaged in or had been engaged in criminal activity.[22]  The following information supported the investigatory stop.  In

---

[22]The facts that form a part of the collective knowledge relied upon to establish a reasonable suspicion to detain Defendant is not limited to observations relayed in detail to the deputy by other law enforcement personnel involved in the investigation or to observations the deputy personally made during the traffic stop.  In United States v. Glinton, 154 F.3d 1245 (11th Cir. 1998), the Eleventh Circuit Court of Appeals rejected a defendant's argument that because the officers effecting the stop of the vehicle in which he was riding did not have personal knowledge establishing a reasonable suspicion of criminal activity, the stop was unlawful.  Noting "that reasonable suspicion is determined by the *collective* knowledge of the officers involved in the stop[,]" the court stated, "The fact that the task force officers who ordered the stop by radio had reasonable suspicion to believe [the defendant] was

July 2010, investigators received information from a juvenile about being transported by Defendant Hernandez, along with other women, from Atlanta "to a nightclub in the Montgomery, Alabama area for the purpose of engaging in commercial sex acts with patrons of a bar there." (Tr. at 71, 93). During the investigation that followed, investigators determined that Defendant, after traveling to various locations in the Atlanta area to pick up females, routinely traveled in a 2003 Honda Odyssey, silver/gun-metal gray, from Atlanta to Birmingham, Alabama, using I-20, and frequented a nightclub, the Yellow Rose. (Tr. at 70, 77). Defendant traveled to Birmingham on Friday and returned to Atlanta on Sunday. (Tr. at 70). As recently as June 2012, the investigators followed Defendant with the females in her Honda to the nightclub in Birmingham. (Tr. at 72-73). Upon arriving at the nightclub, while in the vehicle, the women applied make-up and changed clothes. (Tr. at 73-74, 94).

---

carrying drugs satisfies the Terry requirements for an investigative stop." Id. at 1257 (emphasis in original). See, e.g., United States v. Goddard, 312 F.3d 1360, 1363-64 (11th Cir. 2002) ("Observations and other information supplied by officers involved in a common investigation can, taken together, create probable cause for a search."); United States v. Kapperman, 764 F.2d 786, 791 n.5 (11th Cir. 1985) (although the officer effecting the stop "may not have known all of the facts already uncovered in the investigation[,]" he "was entitled to act on the strength of the radio communication directing him to 'stop the vehicle and secure the scene'").

AO 72A
(Rev.8/82)

During one surveillance at the nightclub, investigators observed the Honda repeatedly going to a hotel, where it remained for thirty to forty minutes, before returning to the nightclub.  (Tr. at 74).   And the investigators also utilized an undercover agent, with a confidential informant, to enter the nightclub to speak with Defendant Hernandez about arranging dates for a fictitious party that he was having for a friend.  (Tr. at 74-75).  Defendant expressed an interest in supplying the women for the party, but there was no mention of prostitution, and she and the undercover agent engaged in some subsequent text messages about the party.  Due to the fact that the investigators did not attempt to carry-through with the operation, nothing else occurred.  (Tr. at 76-77, 95-96).  These facts support Investigator Yates' specific and reasonable belief, upon which the deputy relied, that Defendant and the females with her traveling in the Honda from Birmingham on I-20 on Sunday, June 24, 2012, had been engaged in unlawful activity and would have currency with them because "prostitutes are known to carry the proceeds of their trade with them."  (Tr. at 79).

Accordingly, Deputy Manwaring was also justified in initially detaining Defendant to conduct an investigatory detention.  See United States v. Acosta, 363 F.3d 1141, 1144 (11th Cir. 2004).  To determine the reasonableness of the investigatory detention, the court considers whether the events subsequent to the initial stop were

21

reasonably related in scope to the circumstances which justified the stop.  See United States v. Hardy, 855 F.2d 753, 758 (11th Cir. 1988).  Or whether, as Defendant contends, the duration of the stop became unreasonable such that Defendant was being unlawfully detained and was in custody for purposes of Miranda warnings when questioned.  In resolving this issue, several factors should be addressed, including: the law enforcement purposes to be served by the stop; the time needed to effectuate the purposes; the officers' diligence in pursuing the investigation; and the scope and intrusiveness of the detention.  See United States v. Sharpe, 105 S. Ct. 1568, 1575 (1985); Acosta, 363 F.3d at 1146 (same).  And "the most important factor 'is whether the [deputies and investigators] detained [Defendant] to pursue a method of investigation that was likely to confirm or dispel their suspicions quickly, and with a minimum of interference.'" United States v. Gil, 204 F.3d 1347, 1351 (11th Cir. 2000) (quoting Hardy, 855 F.2d at 759).  "No bright line test separates an investigatory stop from an arrest.  Instead, whether a seizure has become too intrusive to be an investigatory stop and must be considered an arrest depends on the degree of intrusion, considering all of the circumstances."  Blackman, 66 F.3d at 1576.  In this case, the law enforcement purposes for the stop were two-fold, to process the traffic violation

22

and to investigate the underlying federal criminal violations. And Deputy Manwaring proceeded to diligently pursue both purposes in conducting the stop.

During the first ten minutes of the detention, Deputy Manwaring was conducting a routine traffic stop for the failure to maintain lane violation. He approached the Honda, advised Defendant of the reason for the stop, obtained Defendant's driver's license and vehicle registration, and requested that she exit the vehicle to speak to him. (Tr. at 18-20; Gov't Ex. 2; Doc. 45, Attachment A at 2). Once in the patrol vehicle, while attempting to verify Defendant's driver's license and vehicle registration and check on any warrants on GCIC, the deputy briefly spoke with Defendant about the traffic violation and her travel to and from Birmingham. He was also going to prepare a warning for Defendant and advised her of that fact. (Tr. at 22-24; Doc. 45, Attachment B at 2-5). See Ramirez, 476 F.3d at 1237 n.11 (a court does "not inquire as to the substantive reasonableness of the questions that are asked by a police officer in the context of a traffic stop, but only whether the 'duration' of the detention was prolonged 'for an unreasonable time'") (quoting Hernandez, 418 F.3d at 1209 n.3); United States v. Ffriend, 151 Fed. Appx. 778, 779 (11th Cir. 2005) ("Moreover, during a legal stop, an officer may ask questions, including questions not strictly related to the traffic stop, while waiting for a computer check of registration or examining a driver's

23

license.").  Within eight minutes of stopping Defendant's vehicle, the deputy was discussing with Defendant the problems with individuals transporting drugs, guns and money on I-20 and requesting her cooperation by allowing a search of the Honda and all of the contents of the vehicle.  Defendant agreed to the search.[23]  (Tr. at 23, 25; Doc. 45, Attachment B at 5-6).

In Hernandez, 418 F.3d 1206, although the Eleventh Circuit Court of Appeals decided the case based on finding that from its inception the valid traffic stop involved additional suspicious factors triggering the officer's right to investigate further (which is the case herein), the court noted:

> But something else seems worth pointing out.  Where at its inception a traffic stop is a valid one for a violation of the law, we doubt that a resultant seizure of no more than seventeen minutes can ever be unconstitutional on account of its duration: the detention is too short.  By the way, no appellate decision has been called to our attention [or for that matter to this court's attention] that has held such a short detention - linked to a legitimate traffic stop - to be an unreasonable seizure under the Fourth Amendment on account of the stop's duration.

---

[23]The court will further address the voluntariness of the search *infra*.

24

418 F.3d at 1212 n.7[24]; accord United States v. Hawkins, 2011 WL 2313672, at *4 (M.D. Ala. May 27, 2011) (finding that traffic stop of twenty-eight minutes not unreasonable given prior circuit court decisions allowing traffic stop of fifty minutes, citing Hardy, 855 F.2d at 761, twenty minutes, citing United States v. Geboyan, 367 Fed. Appx. 99, 100 (11th Cir. 2010), and fourteen minutes, citing Purcell, 236 F.3d at 1278).  The initial detention was reasonable and was not extended beyond a reasonable amount of time to conduct a traffic stop.

And, by seeking a consent to search the vehicle to determine whether, as Investigator Yates believed, proceeds of Defendant's prostitution activities would be located in the Honda and then promptly proceeding to conduct the search, the investigation "was designed to lead to a quick and non-intrusive resolution of the [investigator's] reasonable suspicions, the first factor weighs in favor of the legality of the stop."  Acosta, 363 F.3d at 1146 (making this finding based on the facts that, after detaining Acosta, the officers questioned him, sought permission to search his

---

[24]The court further noted that a traffic stop can last long enough for police "to conduct a variety of checks about licenses, registration, insurance and so on" and that "the police are not constitutionally required to move at top speed or as fast as possible."  Id.  "And at a traffic stop, the police can occasionally pause for a moment to take a breath, to think about what they have seen and heard, and to ask a question or so."  Id.

vehicle, left to obtain consent to search and searched an apartment associated with Acosta, and returned to obtain permission from Acosta to search a bag found in the apartment).

The second factor also weighs in favor of the legality of the stop.  As soon as the deputy was able to identify the remaining vehicle occupants and remove them from the Honda, he began his search.  (Tr. at 25-26, 28-29; Doc. 45, Attachment A at 7-8).  When the deputy looked inside the Honda, he observed numerous purses each with bundles of U.S. currency lying in plain view on the top.  He stated that, based on his experience, the manner in which the currency was kept, folded with rubber-bands, was not usual for innocent travelers.  (Tr. at 27, 55-57).  When Deputy Yount observed the bundles of currency, he advised Deputy Manwaring, "It's all working cash from where they made it last night it looks like.  You know how - - how dope boys keep their cash?  It's kept the same way."  (Doc. 45, Attachment C at 5).  Finding this currency provided additional grounds - heightened reasonable suspicion - and confirmed the HSI investigator's beliefs about Defendant's involvement in criminal conduct justifying further investigation and detention of Defendant.

The next step taken to further the investigation involved removing the purses with the currency from the Honda and, with the assistance of Deputy Yount while

26

Deputy Manwaring continued the vehicle search, questioning Defendant and the other occupants to identify who owned which purse and how much currency was in each purse - according to the owners, and to question Defendant about the source of the currency. (Tr. at 29-36; Doc. 45, Attachment C at 6-13). All of this activity was concluded within approximately thirty minutes after the stop was initiated. (Tr. at 35). When Investigator Yates arrived during this time frame, he decided that he would be administratively seizing the currency for civil forfeiture proceedings. (Tr. at 36, 40-41, 84-85-91, 105). In order to process the paperwork required to initiate forfeiture in a safer location than on the side of the interstate, Deputy Manwaring asked and Defendant agreed to move to a parking lot located at the next exit. (Tr. at 40-41; Doc. 45, Attachment A at 12-13). Everyone promptly moved to that location, arriving approximately forty minutes into the stop.

During the next hour, the paperwork for the currency seized from each purse was prepared by obtaining biographical information from Defendant and the other five occupants.[25] (Tr. at 45-49; Doc. 45, Attachment C at 16-60). Processing the

---

[25]Additionally, Deputy Manwaring was still attempting to obtain verification concerning Defendant's driver's license to be sure that it was simply expired and not fake as Deputy Yount thought might be the case. (Tr. at 29; Doc. 45, Attachment A at 10-11, Attachment C at 5-6). Although Deputy Manwaring stated that he was not concerned if it was only expired, he was apparently not sure of that fact until later. (Tr.

paperwork required a lengthy period of time, and the only investigation arguably conducted during this time were the interviews with each passenger, including with Defendant late in that process, about the source of the currency.  However, nothing in the record before the court indicates that the deputies and the investigators unduly delayed completing the <u>Terry</u> stop.

"Under the third factor[, the court] ask[s] whether the scope and intrusiveness of the detention exceeded the amount reasonably needed by police to ensure their personal safety." <u>Acosta</u>, 363 F.3d at 1146.  The detention of Defendant and the other females was minimally intrusive.  Besides maintaining possession of the purses, currency and identifications, there were no other restraints used during the <u>Terry</u> stop. (Tr. at 29, 42-43, 53-54, 91-92; Gov't Ex. 2).  Except for directing Defendant and the others to remain safely away from the side of the interstate (Doc. 45, Attachment A at 7-8, 14, Attachment C at 2, 9, 18), they were free to move around and sit together and talk (Tr. at 101, Gov't Ex. 2).  When the location of the <u>Terry</u> stop was moved, Deputy Manwaring asked for and received Defendant's agreement.  (Tr. at 40-41, 44; Doc. 45,

_____

at 59-61; Doc. 45, Attachment A at 17).  While a delay of over an hour for a traffic stop simply to obtain verification of driver's license and vehicle information might be unreasonable, given the additional facts in this case providing reasonable suspicion to extend the stop, the court simply considers this as another factor justifying the detention.

28

Attachment A at 12-13). He also explained why he was holding the purses and that he would return the items at the parking lot - indicating that Defendant and the others would be free to leave at the completion of the stop. (Tr. at 44; Doc. 45, Attachment A at 13). Defendant never asked to leave or acted in a manner evidencing a desire to terminate the stop, including when Defendant began driving to the next exit without waiting for one of the deputies to lead the way. (Tr. at 23-24, 43, 62-63, 66, 91). The court does not find that Defendant's early mention of her cousins having a flight to Puerto Rico at 3:00 p.m. - which none of the ladies ever mentioned during the rest of the stop - made the stop unduly intrusive by causing them to miss that flight.[26] (Tr. at 23-24; Gov't Ex. 2). And Defendant's interaction with the deputies, and especially with the HSI investigators at the parking lot, did not evidence any fear, intimidation or other concerns. She was very comfortable and friendly. (Gov't Ex. 2). As the court in Acosta noted, "the very nature of a Terry stop includes stopping a suspect from leaving. '[A]n investigatory stop is not an arrest despite the fact that a reasonable

---

[26]In fact, the court notes that, if anyone of the Honda's passengers really did have a flight to Puerto Rico at 3:00 p.m., due to the fact that the traffic stop commenced at 1:20 p.m. in Douglas County, it is doubtful they would have arrived in time to catch any such flight. The court also notes, from the subsequent conversations with each of the passengers at Jo-Ann's parking lot, that no one provided an address in Puerto Rico. (Doc. 45, Attachment C at 16-51).

29

person would not believe he was free to leave.'" 363 F.3d at 1147 (citing <u>Blackman</u>, 66 F.3d at 1576, in which FBI agents, possessing a reasonable suspicion that four individuals were involved in armed bank robberies, asked the individuals to exit an apartment one-by-one with their hands above their heads, and as the individuals exited the apartment, they were handcuffed for officer safety, was found not to constitute an arrest).

The final factor to consider "is whether the duration of the detention was reasonable." <u>Acosta</u>, 363 F.3d at 1147.  There is no rigid rule to be applied to this factor; instead, "'common sense and ordinary human experience'" governs the analysis.  <u>Id.</u> (quoting <u>Sharpe</u>, 105 S. Ct. at 1575).  The traffic stop began at approximately 1:20 p.m. and concluded at approximately 3:03 p.m.  (Tr. at 13, 39).  The court finds that Defendant was detained for approximately one hour and forty-eight minutes, that is, one-hundred eight minutes.[27]  (Tr. at 49).  For thirty to thirty-

---

[27]The Government in the supplemental brief contends the length of the detention should be calculated from the time Defendant consented to the search of the Honda. [Doc. 47 at 1, citing <u>Hernandez</u>, 418 F.3d at 1209-10].  The court in <u>Hernandez</u> stated, "Once Defendant gave her consent, the clock re-started for purposes of evaluating the reasonableness of the duration of the intrusion." 418 F.3d at 1209-10.  However, as only eight minutes had elapsed at that point in time, and another hour and forty minutes elapsed before the stop terminated, applying <u>Hernandez</u> to this case does not measurably alter the court's analysis.  This is not a situation where the traffic stop was completed and the driver was free to leave when consent was given, such that the

five minutes of this time frame, Deputies Manwaring and Yount were working the

traffic stop as well as conducting a <u>Terry</u> stop based on the reasonable suspicion that

Defendant, and the other vehicle occupants, were or had been engaged in criminal

activity.  (Tr. at 18-42).  The final hour of the stop, for the most part, involved

processing the administrative paperwork, which included asking Defendant and the

other females about the source of the currency.  (Tr. at 45-51, 84-91; Doc. 45,

Attachment C at 16-60).  This was a time-consuming process due to the number of

women, the language difficulty with some of the passengers (although an investigator

was present to translate), and the paperwork to be completed.  This period of time,

under the circumstances of this case, does not dictate a finding that Defendant was

under arrest.[28]  <u>See</u> <u>Gil</u>, 204 F.3d at 1350 (rejecting a contention that the defendant's

---

entire encounter had become consensual.  <u>See</u> <u>Ramirez</u>, 476 F.3d at 1237-39 (the
encounter became consensual with the return of the defendant's driver's license and
issuance of the warning; therefore, the duration of the subsequent questioning did not
implicate the Fourth Amendment).

[28]The court will address the impact of this determination on the admissibility of
Defendant's statements *infra*.

seventy-five minute detention in handcuffs in the back seat of a patrol vehicle exceeded reasonable <u>Terry</u> stop).[29]

And, as noted, the time lapse, in and of itself is not determinative. The court must consider whether the police diligently pursued a means of investigation likely to confirm or dispel their suspicions quickly. <u>Gil</u>, 204 F.3d at 1351. The court has determined that, in this case, the deputies and investigators did so. In <u>United States v. Davis</u>, 151 F. Supp. 2d 1343 (M.D. Ala. 2001), the court noted that "judges must keep in mind that the bottomline of fourth-amendment analysis is reasonableness, not scrutiny or technicalities." <u>Id.</u> at 1345. The court finds the following statement and conclusion applicable to this case:

---

[29]Defendant's reliance on the decision in <u>Simmons</u>, 172 F.3d 775, to judge the reasonableness of the detention is misplaced. <u>Simmons</u> involved a pure traffic stop as contrasted to this case which also involved an investigatory detention based on reasonable suspicion. Defendant contends that she was only being detained for the purpose of determining whether her driver's license was fake or just expired. [Doc. 38 at 8-11]. While, as noted, that was one reason for the continued detention, the most compelling reasons for continuing the detention dealt with the criminal investigation and the seizure of the currency. And Defendant's claim that Deputy Manwaring could have concluded the traffic stop in a much shorter time and returned Defendant's drivers license to her [<u>Id.</u> at 11] does not address these additional reasons. And concluding the "traffic" stop would not have resulted in Defendant's detention being terminated at any earlier point in time due to the forfeiture processing of the currency - and Defendant makes no argument that the HSI investigators failed to act reasonably or diligently in completing that part of the detention.

> Although the length of time an individual is detained by the police must be a factor the court considers, the proper analysis looks to the reasonableness of the full context of the situation. Absent extraordinary circumstances, which are not present here, judges should not flyspeck the actions of police engaged in general every-day investigatory activity as if the court were looking for some constitutional violation; for general fourth-amendment analysis, police should not be required to justify their time by the second and minute. Here, the full context of this situation leaves little doubt that the actions of the police were reasonable and no constitutional violation occurred.

Id. Accordingly, the court finds that the total amount of time that Defendant was detained was reasonable in relation to the dual purposes of the stop, as well as the need to process the civil forfeiture paperwork.

## B.   Consent

Defendant contends that her consent to search the Honda and all of its contents was not voluntary due to the following:  Deputy Manwaring was armed; the consent occurred while she was seated in the patrol vehicle; the deputy had Defendant's identification; and she had limited understanding of English.  [Doc. 38 at 16-19]. Defendant also contends that the scope of the search exceeded Defendant's consent due to the following:  the length of time required for the search, moving to a new location, another passenger objected, and the investigators seized the currency.  [Id. at 20-21].

33

"It has been long recognized that police officers, possessing neither reasonable suspicion nor probable cause, may nonetheless search [a vehicle] without a warrant so long as they first obtain the voluntary consent [for the search]." United States v. Blake, 888 F.2d 795, 798 (11th Cir. 1989) (citing Schneckloth v. Bustamonte, 93 S. Ct. 2041 (1973)); accord United States v. DeJesus, 435 Fed. Appx. 895, 901 (11th Cir. 2011) (same). "Whether a suspect voluntarily gave consent to a search is a question of fact to be determined by the totality of the circumstances." Id. at 798 (citing Schneckloth, 93 S. Ct. at 2059); see also United States v. Nuyens, 17 F. Supp. 2d 1303, 1306 (M.D. Fla. 1998) ("Voluntariness of consent is a question of fact, and the Court must look to the totality of the circumstances."). "The government bears the burden of proving both the existence of consent and that the consent was not a function of acquiescence to a claim of lawful authority but rather was given freely and voluntarily." Blake, 888 F.2d at 798 (citing United States v. Massell, 823 F.2d 1503, 1507 (11th Cir. 1987)); see also Purcell, 236 F.3d at 1281 ("A consensual search is constitutional if it is voluntary; if it is the product of an 'essentially free and unconstrained choice.'") (citation omitted).

As the Eleventh Circuit Court of Appeals affirmed in Acosta, 363 F.3d 1141, "determining whether consent was 'voluntary is not susceptible to neat talismanic

34

definitions; rather, the inquiry must be conducted on a case-by-case analysis.'" Id. at 1151 (quoting Blake, 888 F.2d at 798).  In conducting this case-by-case analysis, factors considered by courts in assessing voluntariness include, but are not limited to: "'voluntariness of the defendant's custodial status, the presence of coercive police procedure, the extent and level of the defendant's cooperation with police, the defendant's awareness of his right to refuse to consent to the search, the defendant's education and intelligence, and, significantly, the defendant's belief that no incriminating evidence will be found.'" Blake, 888 F.2d at 798 (citations omitted); see also Purcell, 236 F.3d at 1281 (same).

However, "the government need not establish [a defendant's] knowledge of the right to refuse consent 'as the *sine qua non* of effective consent.'"  United States v. Zapata, 180 F.3d 1237, 1241 (11th Cir. 1999) (quoting Ohio v. Robinette, 117 S. Ct. 417, 421 (1996)); accord United States v. Brown, 223 Fed. Appx. 875, 880 (11th Cir. 2007) ("the government is not required to prove that the defendant knew he had the right to refuse consent, and a defendant's lack of knowledge of this right is not dispositive, but is just one factor to consider in evaluating the totality of the circumstances"); United States v. Pineiro, 389 F.3d 1359, 1366 n.4 (11th Cir. 2005) ("To the extent Pineiro suggests that the police were required to be more specific in

35

advising him of his rights, and were required to tell him he had a right to refuse consent, this Court has squarely rejected this argument."). And, contrasting the test for the waiver of "rights that protect a fair criminal trial and the rights guaranteed under the Fourth Amendment[,]" <u>Schneckloth</u>, 93 S. Ct. at 2055, the Supreme Court explained that, while a consent to search must be voluntary, it need not be "'an intentional relinquishment or abandonment of a known right or privilege[,]'" that is, knowing and intelligent. <u>Id.</u> at 2055-56 (citation omitted); <u>see also</u> <u>Tukes v. Dugger</u>, 911 F.2d 508, 516 (11th Cir. 1990) (same). "'[T]he absence of intimidation, threats, abuse (physical or psychological), or other coercion is a circumstance weighing in favor of up-holding what appears to be a voluntary consent.'" <u>United States v. Alim</u>, 256 Fed. Appx. 236, 239 (11th Cir. 2007) (quoting <u>United States v. Jones</u>, 475 F.2d 723, 730 (5th Cir. 1973)).

Defendant cites to the facts that Deputy Manwaring was armed, although he never displayed his weapon, that the deputy had possession of her identification, and that she was seated in the patrol vehicle as evidence that she did not voluntarily consent to the search. However, the evidence demonstrates that Defendant had been detained for the traffic stop for less than ten minutes at the time consent was requested, that the deputy made no show of force, that he did not physically restrain Defendant,

36

that he did not raise his voice or make demands but sought Defendant's cooperation, and that Defendant's demeanor was cooperative, pleasant and calm as evidenced by a review of the videotape.  (Tr. at 19-25; Gov't Ex. 2).  These facts simply do not support a finding that Defendant was coerced into consenting to a search of the Honda.  The fact that the deputy still had possession of her driver's license is not determinative of whether the consent was voluntary.  See Purcell, 236 F.3d at 1282 ("whether the officer had returned the driver's license of the defendant at the time the defendant consented to the search is a factor [the court] shall consider in evaluating the totality of the circumstances, but it is not a litmus test for voluntary consent").  In fact, situations involving substantially greater demonstrations of force and physical restraint of a suspect have not been found to establish that a consent was coerced.  See, e.g., United States v. Kimoana, 383 F.3d 1215, 1225-26 (10th Cir. 2004) (although "officers entered the motel room with guns drawn, raising their voices at the occupants and ordering them to put their hands where the officers could see them[,]" the trial court found that "[a]fter performing a pat down, the officers put their weapons back in their holsters, the atmosphere was described as 'calm,' and then [the officer] 'immediately' asked [the defendant] for consent to search the room[;]" therefore, when the consent to search was obtained, the situation had calmed down and no show of force was being

37

exhibited); <u>United States v. Taylor</u>, 31 F.3d 459, 463-64 (7th Cir. 1994) ("The record shows that the initial melee of agents, badges and weapons, necessary to protect the safety of the agents . . ., dissipated only seconds after it had begun and that all was routine once the premises had been secured.  Though certainly unpleasant, there is nothing so inherently coercive about such tactics, commonly used where a danger to life or limb is perceived by law enforcement agents, to render subsequent cooperation involuntary."); <u>United States v. Hidalgo</u>, 7 F.3d 1566, 1570-71 (11th Cir. 1993) (facts that the defendant was arrested by "SWAT team members who broke into his home in the early morning, woke him, and forced him to the ground at gunpoint" did not establish consent to search was involuntary, even though consent was given after invocation of <u>Miranda</u> rights); <u>United States v. Garcia</u>, 890 F.2d 355, 360-62 (11th Cir. 1989) (the court found voluntary a consent to search which was given after the defendant was arrested by numerous officers, patted down for weapons and a protective sweep of his house was conducted and after he was seated in his living room in handcuffs, given his <u>Miranda</u> rights, and the officers had refused to accept a limited consent).

Defendant also contends that her consent was not voluntary because of her limited understanding of English. "In determining whether an individual has sufficient

38

comprehension of English to provide voluntary consent, courts examine [the defendant's] ability to interact intelligently with the police." <u>Zapata</u>, 180 F.3d at 1242. In this case, the record establishes that Defendant was able to interact with the deputies and HSI investigators intelligently. When Deputy Manwaring initially approached the Honda, he asked for Defendant's driver's license and vehicle registration and was provided with both items, apparently without any misunderstanding. Defendant also understood the request to exit the Honda and accompany him to the patrol vehicle. (Gov't Ex. 2; Doc. 45, Attachment A at 2). Once seated in the patrol vehicle, the deputy and Defendant conversed about the reason for the traffic stop and whether she was tired or drinking. And Defendant asked the deputy about his ancestry, that is, was he Chinese. She also provided answers to the deputy's questions about her travel to Alabama and the passengers in the Honda. (Doc. 45, Attachment B at 2-4). Defendant responded appropriately during this conversation.

The deputy then explained to Defendant about the use of I-20 to transport drugs, guns and money and asked if Defendant had any such items in the Honda.[30] (<u>Id.</u> at 5).

---

[30]Defendant points out that her comment in response about not drinking because she is pregnant demonstrated her lack of understanding [Doc. 38 at 17-19; <u>and see</u> Doc. 45, Attachment B at 5); however, the court notes that the deputy had also asked Defendant a few minutes before if she had been drinking (Doc. 45, Attachment B at 2). Defendant's comment may have been referring back to that inquiry.

Deputy Manwaring then asked, "Can I search the vehicle and the contents of the van for drugs or . . ." to which Defendant interjected, "Yes[,]" and he continued, "or guns or money? I can search?"  (Doc. 45, Attachment B at 5).  Nodding her head affirmatively, Defendant responded, "Um-hm."   And the deputy confirmed, "Everything inside I can search?"  She responded, "Yes. . . .  You can look in everything."  (Id.).  And, just to be sure, the deputy asked again, "I can look in everything?"  Defendant said, "Yes."  (Id. at 5-6).  There is nothing about this exchange that would have indicated to Deputy Manwaring - or that indicates to the court - that Defendant did not understand his questions and did not voluntarily consent. Although Defendant was not fluent in English, she communicated with the deputies and the HSI investigators in English - even when asked questions in Spanish.  Having reviewed all of Defendant's interactions with the deputies and investigators on the videotape, the court agrees with the investigator, who was present to communicate with Defendant and the Honda's passengers in Spanish as needed, who stated, "She speaks pretty good English."  (Doc. 45, Attachment C at 59).

The fact that Defendant may have had some difficulty with some words or that the deputies may have repeated a few requests or provided some information more than once on a few occasions does not undermine the voluntariness of the consent to search

40

the Honda and the vehicle's contents.  Additionally, Defendant never objected to the search or examination of the purses once begun by the deputies.  (Gov't Ex. 2). See United States v. Guzman, 454 Fed. Appx. 531, 534 (8th Cir. 2012) (although there was a "'language barrier'" and "'apparent lapses in communication'" between the defendant and the officer, the court noted that the defendant "responded appropriately to most of the questions and requests made by [the officer and that the defendant] did not object to the search once it had begun," the court upheld the consent); United States v. Gamez-Acuna, 375 Fed. Appx. 809, 814-15 (10th Cir. 2010) (because the defendant was able to provide information to the Trooper about various topics and to follow the Trooper's directions and was able to understand and respond appropriately to most of the questions, the court found that the defendant "understood sufficient English to freely and unequivocally consent"); United States v. Valdez, 147 Fed. Appx. 591, 596 (6th Cir. 2005) (finding that the defendant's "tenuous grip on the English language [did not] render[ ] his consent involuntary[,]" the court noted that the defendant responded appropriately to inquiries and requests to produce documents).

Defendant's consent to search the Honda and everything inside was voluntary. With respect to the issue of exceeding the scope of a consent to search, in Zapata, 180 F.3d at 1242, the Eleventh Circuit Court of Appeals stated:  "We have said that a

41

search is impermissible when an officer does not conform to the limitations imposed by the person giving consent." <u>Accord</u> <u>DeJesus</u>, 435 Fed. Appx. at 902 ("'A consensual search is manifestly reasonable so long as it remains within the scope of the consent.'") (citation omitted). And, "[w]hen an individual provides a general consent to search, without expressly limiting the terms of [her] consent, the search 'is constrained by the bounds of reasonableness: what a police officer could reasonably interpret the consent to encompass.'" <u>Zapata</u>, 180 F.3d at 1242 (quoting <u>Strickland</u>, 902 F.2d at 941); <u>accord</u> <u>DeJesus</u>, 435 Fed Appx. at 902; <u>United States v. Street</u>, 472 F.3d 1298, 1308 (11th Cir. 2006). In this regard, in <u>Florida v. Jimeno</u>, 111 S. Ct. 1801 (1991), the Supreme Court stated, "The standard for measuring the scope of a suspect's consent under the Fourth Amendment is that of 'objective' reasonableness–what would the typical reasonable person have understood by the exchange between the officer and the suspect?" <u>Id.</u> at 1803-04; <u>accord</u> <u>Street</u>, 472 F.3d at 1309.

"To ascertain what conduct is within the 'bounds of reasonableness,'" [a court] must consider what the parties knew to be the object (or objects) of the search. . . . A general consent to search for specific items includes consent to search any compartment or container that might reasonably contain those items." <u>Zapata</u>, 180 F.3d at 1243; <u>see also</u> <u>Jimeno</u>, 111 S. Ct. at 1804 ("The scope of a search is generally

42

defined by its expressed object."); <u>United States v. Harris</u>, 716 F. Supp. 1470, 1474 (M.D. Ga. 1989) ("As noted by the Supreme Court, '[a] lawful search of fixed premises generally extends to the entire area in which the object of the search may be found and is not limited to the possibility that separate acts of entry or opening may be required to complete the search.'") (citation omitted).  The scope of the consent to search is "to be determined by the totality of the circumstances."  <u>Blake</u>, 888 F.2d at 798.

Defendant's contentions that the deputies exceeded scope of the consent to search by moving the vehicles, extending the duration of the search, and then rifling through the purses and seizing the money, over the objection of one of the other passengers [Doc. 38 at 20-21], does not call into question the initial search of the Honda and seizure of the purses containing the currency - all of which took place within thirty minutes of the stop commencing and at the original location of the stop. (Tr. at 26-36, 48; Gov't Ex. 2).  The consent to search for drugs, guns and money involved items that necessarily would be secreted in other containers within the Honda. While the processing of the paperwork for currency seizure was subsequent to the relocation to the parking lot, the search of the Honda resulting in the seizure of the currency had been completed - without any objection from Defendant, the only person

43

before the court whose consent is relevant to this motion to suppress.  (Tr. at 60-63, 85-91; Gov't Ex 2).  No further search of the Honda occurred after the move to the parking lot.  (Tr. at 48).  And Defendant's consent to search the Honda for drugs, guns and money and to search "everything" inside the vehicle placed no restrictions on the scope of the consent.  (Tr. at 23-25; Doc. 45, Attachment B at 5-6).  Accordingly, although Deputy Manwaring observed the currency lying on top of the purses and did not have to search those containers (Tr. at 27, 55-57), he was authorized to do so by Defendant's consent.

Defendant voluntarily consented to the search and did not limit the extent of the search, and the deputies' search did not exceed the scope of that consent.[31]

---

[31]As an alternate reason for upholding the vehicle search, the Government contends that the deputy had probable cause to conduct the search even if Defendant's consent was not voluntary.  [Doc. 45 at 28-29].  See Pennsylvania v. Labron, 116 S. Ct. 2485, 2487 (1996) (Under the "automobile exception," "[i]f a car is readily mobile and probable cause exists to believe it contains contraband, the Fourth Amendment . . . permits police to search the vehicle without more.").  Having found that Defendant's consent was voluntary, the court will not address this argument; however, the court is not at all sure that the facts known to the deputy, as relayed by the HSI investigators, although providing reasonable suspicion for the detention, established probable cause to search the Honda.  See United States v. Magluta, 418 F.3d 1166, 1182 (11th Cir. 2005) ("Probable cause for a search exists when under the totality of the circumstances there is a fair probability that contraband or evidence of a crime will be found in a particular place.") (citations and internal quotation marks omitted).

44

## C.     Statements

Defendant's final argument in support of the motion to suppress addresses the statements that she made during the traffic and Terry stop.  Defendant contends that, because the deputies had possession of her driver's license and purse - as well as the identifications and purses of the other Honda passengers, because their movements were restricted, and because Defendant had stated two of her nieces had a flight to Puerto Rico but they were not allowed to leave, she was in custody and should have been advised of her Miranda rights.  Due to the fact that she was not, Defendant, therefore, contends that all of her statements should be suppressed.  [Doc. 38 at 12-15]. While Defendant was clearly detained during the stop, as already determined by the court, the detention was not a *de facto* arrest requiring Miranda warnings.

In Miranda v. Arizona, 86 S. Ct. 1602 (1966), the Supreme Court held that "a person questioned by law enforcement officers after being 'taken into custody or otherwise deprived of his freedom of action in any significant way' must first 'be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed.'" Stansbury v. California, 114 S. Ct. 1526, 1528 (1994) (quoting Miranda, 86 S. Ct. at 1612).  The Supreme Court recently clarified "that the

45

freedom-of-movement test identifies only a necessary and not a sufficient condition for <u>Miranda</u> custody." <u>Maryland v. Shatzer</u>, 130 S. Ct. 1213, 1224 (2010).  The Court stated, "We have declined to accord it 'talismanic power,' because <u>Miranda</u> is to be enforced 'only in those types of situations in which the concerns that powered the decision are implicated.'" <u>Id.</u> (quoting <u>Berkemer v. McCarty</u>, 104 S. Ct. 3138, 3148-49 (1984)).  Accordingly, "[a]n officer's obligation to administer <u>Miranda</u> warnings attaches . . . 'only where there has been such a restriction on a person's freedom as to render him in custody.'" <u>Stansbury</u>, 114 S. Ct. at 1528 (quoting <u>Oregon v. Mathiason</u>, 97 S. Ct. 711, 714 (1977) (per curiam)); <u>accord</u> <u>United States v. Brown</u>, 441 F.3d 1330, 1347 (11th Cir. 2006).

This determination "depends on the objective circumstances of the interrogation, not on the subjective views harbored by either the interrogating officers or the person being questioned."[32] <u>Stansbury</u>, 114 S. Ct. at 1529; <u>accord</u> <u>United States v. Beltran</u>, 367 Fed. Appx. 984, 988 (11th Cir. 2010) ("Because the test is objective, the subjective

---

[32]While "[a]n officer's knowledge or beliefs may bear upon the custody issue if they are conveyed, by word or deed, to the individual being questioned[,]" <u>Stansbury</u>, 114 S. Ct. at 1529-30, "[a] policeman's unarticulated plan has no bearing on the question whether a suspect was in custody at a particular time . . .," <u>United States v. Lall</u>, 607 F.3d 1277, 1284 (11th Cir. 2010) (citation and internal quotation marks omitted).

46

beliefs of the defendant and the interviewing officer on whether the defendant was free to leave is irrelevant."); <u>Street</u>, 472 F.3d at 1309 (same). "'[U]nder the objective standard, the reasonable person from whose perspective custody is defined is a reasonable innocent person.'" <u>Street</u>, 472 F.3d at 1309 (citation omitted); <u>see also</u> <u>Brown</u>, 441 F.3d at 1347 (same); <u>United States v. Moya</u>, 74 F.3d 1117, 1119 (11th Cir. 1996) ("Whether a defendant knows he is guilty and believes incriminating evidence will soon be discovered is irrelevant.").

The circumstances before the court fall outside "the <u>Miranda</u> paradigm[,]" <u>United States v. Ellison</u>, 632 F.3d 727, 729 (1st Cir. 2010), that is, interrogation of a suspect at the police station, or similar circumstances establishing the functional equivalent of an arrest requiring <u>Miranda</u> warnings. Defendant was initially stopped for a routine traffic violation. (Tr. at 18-24; Gov't Ex. 2). As a part of the routine procedure for Deputy Manwaring, he obtained her driver's license and vehicle registration and requested that she sit with him in the patrol vehicle - due in part to the hazard of being parked on the side of the interstate - to discuss the violation and to give her a warning. (Tr. at 19-23; Doc. 45, Attachment B at 2-6). This was a brief and non-intrusive detention during which time the deputy requested and received Defendant's cooperation in allowing a search of her vehicle and the contents of the vehicle. (Tr. at

47

23-25; Doc. 45, Attachment B at 2-6).  Defendant simply was not in custody during this conversation.

In Berkemer, the Supreme Court addressed whether during a routine traffic stop a person was "in custody" requiring Miranda warnings.  The Court, after evaluating the usual circumstances of such temporary detentions, see 104 S. Ct. at 3148-50, held that the "noncoercive aspect of ordinary traffic stops prompts us to hold that persons temporarily detained pursuant to such stops are not 'in custody' for the purposes of Miranda."  Id. at 3150; accord United States v. Ubaldo-Viezca, 398 Fed. Appx. 573, 579 (11th Cir. 2010) ("Ordinary traffic stops do not involve custody for purposes of Miranda, unless the stopped motorist is subjected to treatment during the traffic stop that amounts to a restriction of freedom to a degree associated with a formal arrest."); United States v. Crawford, 294 Fed. Appx. 466, 473 (11th Cir. 2010) (same).

As noted, however, the stop was also an investigatory Terry stop resulting from reasonable suspicion, and Defendant was arguably detained beyond the time necessary to conduct a "routine" traffic stop.  There is no dispute that Defendant - as were the other passengers of the Honda - was detained, that is, not free to leave, from the beginning of the stop at approximately 1:20 p.m., until released with her personal belongings (excepting the seized currency) and given the warning citation at 3:03 p.m.

48

(Tr. at 13, 39, 50, 101-02). The deputies and investigators held Defendant's drivers license and purse preventing her from leaving. (Tr. at 19, 22-25, 27-33, 42-44, 53-54, 100-01). Defendant, however, mistakes being detained or not free to leave with the level of custody necessary to trigger Miranda warnings, which was not reached in this case.[33]

Applying the test set forth in Shatzer to an investigative detention, the Eleventh Circuit Court of Appeals explained:

> [A]lthough a reasonable person in the defendant's position may feel constrained not to leave the scene of a police encounter at a particular moment – and thus may be deemed to have been "seized" by law enforcement – he will not necessarily be considered in "custody" for Fifth Amendment purposes. . . .

---

[33]Defendant cites to a prior report and recommendation of this court to support his argument that Defendant was in custody requiring Miranda warnings. [Doc. 38 at 14, citing United States v. Rangel-Rangel, 1:07-CR-352-BBM-JFK, Doc. 26 (N.D. Ga. April 22, 2008)]. In Rangel-Rangel, the court did not find the defendant was "in custody" due to the agent retaining his driver's license but determined that the consensual encounter with the defendant had ripened into a detention requiring reasonable suspicion. See Rangel-Rangel, Doc. 26 at 21-23. Likewise, the decision in United States v. Thompson, 712 F.2d 1356 (11th Cir. 1983), cited by Defendant [Doc. 38 at 14] and by this court in Rangel-Rangel, does not support Defendant's argument. The Eleventh Circuit Court of Appeals held that a defendant, whose driver's license was retained, was detained and not free to leave under the circumstances of that case; however, the court did not find that the defendant was in custody requiring Miranda warnings. Thompson, 712 F.2d at 1360-61.

AO 72A
(Rev.8/82)

> Rather, "a free-to-leave inquiry reveals *only* whether the person questioned was seized.". . . While "seizure is a necessary prerequisite to <u>Miranda</u>, . . . a court must [also] ask whether . . . a reasonable person would have understood his freedom of action to have been curtailed *to a degree associated with formal arrest*."

<u>United States v. Luna-Encinas</u>, 603 F.3d 876, 881 (11th Cir. 2010) (citations omitted; emphasis in original); <u>see also</u> <u>Ellison</u>, 632 F.3d at 729 ("in dealing with a case outside the <u>Miranda</u> paradigm [that is, interrogation of a suspect at the police station], it is essential to recall that 'the freedom-of-movement test identifies only a necessary and not a sufficient condition for <u>Miranda</u> custody[,]'" the district court explained, "[t]hat is, custody under <u>Miranda</u> means a suspect is not free to go away, but a suspect's lack of freedom to go away does not necessarily mean that questioning is custodial interrogation for purposes of <u>Miranda</u>") (quoting <u>Shatzer</u>, 130 S. Ct. at 1224).

In the case before the court, besides the length of the detention, which this court has determined under the circumstances presented was reasonable, no other factors support a finding that Defendant's "'freedom of action to have been curtailed *to a degree associated with formal arrest*.'"[34] <u>Luna-Encinas</u>, 603 F.3d at 881 (citations

---

[34]As the court already stated, Defendant's early mention of her cousins having a flight to Puerto Rico at 3:00 p.m. - which none of the Honda's passengers ever mentioned again during the stop - did not change the level of detention by causing them to miss that flight - assuming that there really was a flight to catch.  (Tr. at 23-24; Gov't Ex. 2).

50

omitted; emphasis in original).  Defendant was never handcuffed; no weapons were ever displayed; and the deputies and investigators never raised their voices or threatened Defendant.  She was not physically restrained.  Defendant and the other passengers were able to move around, sit with each other and talk.  (Tr. at 20, 23, 43-44, 66, 91-93, 101; Gov't Ex. 2; Doc. 45, Attachment A at 7-8, 14, Attachment C at 2, 9, 18).  When the location of the stop changed, Defendant was asked and agreed to the move - to a public parking lot.  (Tr. at 39-44; Doc. 45, Attachment B at 11-12).  Defendant did not ask to leave, and in fact, Defendant appeared entirely comfortable with the deputies and HSI investigators throughout the detention.  Her demeanor did not reflect an individual who was subject to custodial interrogation.  (Tr. at 91; Gov't Ex. 2).

In Acosta, 363 F.3d 1141, the Eleventh Circuit Court of Appeals refused to find that the defendant was subjected to a custodial interrogation during a Terry stop.  The court noted that the stop occurred in a parking lot of an apartment complex in broad daylight making the officers' actions visible to anyone in the area.  Although weapons were initially drawn, at the time that the defendant was questioned, all the weapons were holstered.  The defendant's driver's license and car keys appear to have been in the officers' possession during the stop, and he was prevented from entering his

vehicle on at least one occasion.  Id. at 1147.  As was true in Acosta, in the instant case:

> The stop did not involve the type of "highly intrusive" coercive atmosphere that may require Miranda warnings even before a formal arrest is made.  The totality of the circumstances were such that a reasonable person in [Defendant Hernandez's] position would not have believed that [she] was utterly at the mercy of the police, away from the protection of any public scrutiny, and had better confess or else.  No Miranda warnings were required at the time.

Id. at 1150; see also United States v. Leshuk, 65 F.3d 1105, 1109-10 (4th Cir. 1995) (finding that statements made during a Terry stop were admissible, the court noted that "we have concluded that drawing weapons, handcuffing a suspect, placing a suspect in a patrol car for questioning, or using or threatening to use force does not necessarily elevate a lawful stop into a custodial arrest for Miranda purposes").

For these reasons, the court finds that Defendant was not subjected to custodial interrogation during the Terry/traffic stop on June 24, 2012.  Accordingly, Miranda warnings were not required, and her statements are admissible.

## III.  Conclusion

For the foregoing reasons and cited authority, the court **RECOMMENDS** that Defendant's motion [Doc. 13] to suppress be **DENIED**.

52

There are no other pending matters before the Magistrate Judge, and the undersigned is aware of no problems relating to the scheduling of this case.

**IT IS THEREFORE ORDERED** and **ADJUDGED** that this action be and the same is hereby, declared Ready for Trial.

**SO RECOMMENDED AND ORDERED** this 12th day of August, 2013.

JANET F. KING
UNITED STATES MAGISTRATE JUDGE

53